IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| DANIELLE WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:15-cv-517 |
| | ) | |
| TRINITY INDUSTRIES, INC. & | ) | |
| TRINITY HIGHWAY PRODUCTS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Plaintiff originally filed this diversity action, on November 13, 2014, in the United States District Court for the Eastern District of Texas, alleging claims for negligence and product liability against Defendants. (ECF No. 1.) Defendants then filed a motion to transfer the action to the Northern District of Texas, the location of their headquarters. (ECF No. 14 at 6.) The District Court for the Eastern District of Texas denied Defendants' motion and *sua sponte* entered an order transferring the case to this Court. (ECF No. 30.) Before the Court is Defendants' Motion to Apply North Carolina Law. (ECF No. 97.) For the reasons that follow, the Court concludes that Texas law should apply.

I.  **BACKGROUND**

Defendants are corporations organized under the laws of Delaware with their principal place of business in Dallas, Texas. (ECF No. 89 ¶¶ 2–3.) They are in the business of manufacturing and selling various highway safety and construction products across the United States. (*Id.* ¶ 12.) On the morning of November 29, 2013, Plaintiff, a resident of Greensboro,

North Carolina, was driving to work on Interstate 40 when she fell asleep and collided with a "guardrail end terminal fitted on the blunt end of a line of guardrail." (*Id.* ¶¶ 1, 7.) Plaintiff contends Defendants "designed, manufactured and marketed" the "impact head" of the guardrail and that "[a]t the time of the accident, the guardrail and impact head in question was defective and unreasonably dangerous." (*Id.* ¶¶ 8, 10.)

Following transfer of the action to this Court, Defendants raised for the first time that North Carolina law applied and that North Carolina's contributory negligence defense barred Plaintiff's claims.[1] (*See* ECF No. 40 ¶¶ 4–5; ECF No. 41 at 6.) Plaintiff then moved to amend her Complaint. (ECF No. 68.) On August 31, 2016, the Court granted in part and denied in part Plaintiff's motion to amend, and Plaintiff filed her First Amended Complaint asserting the following claims: (1) negligence/product liability; (2) strict liability/product liability; and (3) gross negligence, intentional, willful, wanton conduct/punitive damages. (ECF No. 89 at 10–13.) Defendants now move for a determination of whether Texas or North Carolina law applies to this action.

## II. TEXAS CHOICE-OF-LAW PRINCIPLES

Ordinarily, a federal district court sitting in diversity jurisdiction must apply the choice-of-law rules of the forum state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). The parties agree that, because this case was originally filed in the Eastern District of Texas and was transferred to this Court, Texas choice-of-law principles must be

---

[1] Before the action was transferred to this Court, Defendants answered the Complaint and, like Plaintiff, also relied on Texas law for their affirmative defenses. (ECF No. 8 ¶¶ 28–29, 33; ECF No. 9 ¶¶ 28–29, 33.)

2

applied to determine whether North Carolina or Texas law governs this action. (ECF No. 98 at 7; ECF No. 99 at 3.) Which state law should govern an issue "is a question of law for the court to decide"; however, "the state contacts to be considered by the court in making this legal determination involves a factual inquiry." *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 204 (Tex. 2000). Under Texas choice-of-law principles, the party urging application of another state's substantive law bears the burden of providing sufficient information to establish that the law of another state applies. *Janvey v. Suarez*, 978 F. Supp. 2d 685, 692 (N.D. Tex. 2013). Thus, Defendants bear the burden of proof here.

When presented with a choice-of-law question, Texas courts first determine whether there is an actual conflict between the laws of the applicable jurisdictions. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419 (Tex. 1984). If no conflict exists, then a choice-of-law analysis is unnecessary. *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002). Here, the parties agree that the laws of Texas and North Carolina are in conflict with respect to each of Plaintiff's claims. (ECF No. 98 at 7; ECF No. 99 at 3–4.) The Court must, therefore, conduct a choice-of-law analysis to determine which state law governs.

## III. THE RESTATEMENT'S MOST-SIGNIFICANT-RELATIONSHIP TEST

Texas follows the most-significant-relationship test, set out in §§ 6 and 145 of the Restatement (Second) of Conflict of Laws (1971) ("Restatement"), to resolve choice-of-law issues. *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979). Under this test, the court must first determine which state law has the most significant relationship to each issue involved in the action. *Hughes*, 18 S.W.3d at 205. Section 6 of the Restatement outlines the basic policy

3

considerations to be used to decide a choice-of-law question in any given case and directs the Court to consider the following factors:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement § 6(2); *Gutierrez*, 583 S.W.2d at 318–19. Section 145 is the more specific rule, which sets out the factual contacts to be considered when applying the § 6 policy factors. *See Gutierrez*, 583 S.W.2d at 318–19. Section 145 provides that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Restatement § 145(1). Thus, the Court must analyze how the following factual contacts outlined in § 145 impact the policy factors contained in § 6. *See Hughes*, 18 S.W.3d at 205. Section 145 factual contacts include the following:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injured occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

Restatement § 145(2). The Restatement further advises that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.* The number of contacts with a state is not determinative; rather the contacts are to be evaluated by their qualitative character using the policy factors outlined in § 6. *See Torrington Co. v.*

4

*Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000). Because § 145 sets out the factual contacts specific to this case that must be used when applying § 6's general policy principles, the Court will begin its discussion with the § 145 contacts.

**A. Section 145 Factual Contacts**

*1. Place Where the Injury Occurred*

Section 145 provides that "[i]n the case of personal injuries or of injures to tangible things, the place where the injury occurred is a contact that, as to most issues, plays an important role in the selection of the state of the applicable law[.]" Restatement § 145 cmt. e. Here, there is no dispute that the place of injury is North Carolina where the collision occurred.

Defendants argue that where, as in this case, the particular claim involves personal injuries, § 146 of the Restatement creates a presumption that the state where the injury occurred determines the rights and responsibilities of the parties unless some other state, applying the principles set out in §§ 6 and 145, has a more significant relationship to the particular issue. (ECF No. 98 at 9.) It does not appear, however, that the Texas Supreme Court has explicitly adopted the § 146 presumption. *See Burleson v. Liggett Grp.*, 111 F. Supp. 2d 825, 829 n.4 (E.D. Tex. 2000) (explaining that "Texas has only adopted part of the Restatement and has not adopted the presumption in § 146"). Nevertheless, some Texas courts have relied on the presumption in § 146. *See, e.g.*, *Enter. Prods. Partners, L.P. v. Mitchell*, 340 S.W.3d 476, 480 (Tex. App. 2011). While the Texas Supreme Court has not definitively stated whether § 146's presumption applies in cases involving personal injuries, it is clear that the Texas Supreme Court follows a "flexible approach to conflicts problems" in that the place of injury is not dispositive, but is one contact to be considered in determining which state has

5

the most significant relationship to a particular issue. *Gutierrez*, 583 S.W.2d at 318; *accord Herrera* v. *Michelin N. Am., Inc.*, No. B-07-114, 2009 WL 700645, at *9 (S.D. Tex. Mar. 16, 2009); *Baird v. Bell Helicopter Textron*, 491 F. Supp. 1129, 1139 (N.D. Tex. 1980); *see Denman v. Snapper Div.*, 131 F.3d 546, 550 (5th Cir. 1998).

Because North Carolina is the place of injury, this factual contact supports the application of North Carolina law. However, the weight to be given this contact must be determined in relation to the § 6 policy considerations.

### 2. *Place of Conduct Causing Injury*

This contact requires the Court to consider where the conduct causing the injury occurred. In this case, there are several issues presented that must be considered separately to determine the location of the relevant conduct with respect to each issue. Plaintiff brings three claims: (1) negligence/product liability, (2) strict product liability, and (3) gross negligence, intentional, willful, wanton conduct/punitive damages. (ECF No. 89 at 10–13.) In addition, Defendants' defense of contributory negligence may impact resolution of some of these claims. (ECF No. 94 at 15; ECF No. 95 at 15.)

Regarding Plaintiff's claims, the Amended Complaint alleges that Defendants "defectively designed, manufactured, assembled, marketed and/or distributed the altered ET-Plus in a manner that prevent[ed] the impact head system from operating properly, safely, and as intended." (ECF No. 89 ¶ 50.) Plaintiff further alleges that Defendants "knew of the dangerous conditions created by [their] unapproved, modified ET-Plus system" but, despite such knowledge, "knowingly and intentionally produced, marketed, and sold the altered ET-Plus system." (*Id.* ¶¶ 56, 58.) The parties do not appear to dispute that, if the product at issue

6

in this case was manufactured by Defendants,[2] then it was manufactured in Texas. As such, Plaintiff's lawsuit is based not on any actions taken by Defendants in North Carolina; rather, the lawsuit alleges negligence and intentional conduct involving the design, manufacture, and distribution of a defective and unsafe product by Defendants in Texas that they placed into the marketplace in Texas. Texas would appear to have the most significant relationship related to these allegations of wrongdoing. *See Perry v. Aggregate Plant Prods. Co.*, 786 S.W.2d 21, 25 (Tex. App. 1990) ("[S]ince the silo was designed and manufactured in Texas, the cause of action is directed at the design and manufacture of the silo, and . . . it seems that Texas is the place where the conduct causing the injury occurred."); *accord Norwood v. Raytheon Co.*, 237 F.R.D. 581, 595 (W.D. Tex. 2006) ("In a products liability case alleging defective design, courts generally consider the place where the conduct causing the injury occurred to be the place where the product was designed and manufactured."); *Sloss v. Gen. Motors Corp.*, No. Civ.A.3:00CV1036-M, 2001 WL 1081303, at *4 (N.D. Tex. Sept. 12, 2001) (same).

In addition, Texas is the place of the alleged conduct causing injury for purposes of evaluating which state law governs the punitive damages issue. *See Vargas v. Kiewit La. Co.*, No. H-09-2521, 2012 WL 1029517, at *7 (S.D. Tex. Mar. 26, 2012) (holding that Louisiana, not

---

[2] Defendants argue that "the evidence is inconclusive on when, where or by whom the guardrail end terminal was manufactured or sold." (ECF No. 98 at 18.) Specifically, Defendants contend that there is a lack of evidence to establish that the guardrail end terminal was manufactured in Texas, and thus there is an insufficient basis to conclude that this factor weighs in favor of applying Texas law. (*Id.*) However, as Plaintiff points out, there is sufficient evidence in the record that Defendants manufactured the guardrail end terminal at issue here. (*See, e.g.*, ECF No. 73-3; ECF No. 94 ¶¶ 10–11; ECF No. 95 ¶¶ 10–11; ECF No. 99-1 at 7; ECF No. 99-2 at 5; ECF No. 99-3 § 2 at ¶¶ 6–7.) Further, if the jury determines that the evidence does not show, by a preponderance of the evidence, that Defendants manufactured the guardrail end terminal, then Defendants would be absolved of liability, making any choice-of-law determination of little consequence.

7

Texas, had the greatest interest in applying its punitive damages law because defendants allegedly committed the tort in Louisiana, not Texas); *Black v. Toys R US–Delaware, Inc.*, No. 4:08-cv-3315, 2010 WL 4702344, at *11 (S.D. Tex. Nov. 10, 2010) (concluding that South Africa had greatest connection to the punitive damages issue because conduct causing the plaintiff's injury occurred in South Africa).

The Court next considers which state has the most significant relationship to the contributory fault issue.[3] Ordinarily, "[t]he law selected by application of . . . § 145 determines whether contributory fault on the part of the plaintiff precludes h[er] recovery in whole or in part." Restatement § 164(1). Where the plaintiff's conduct that is claimed to constitute contributory fault takes place in the state of injury, the local law of that state "will usually be applied to determine whether the plaintiff's conduct amounted to contributory fault and if so, whether the effect of this fault is to preclude recovery by the plaintiff in whole or in part." *Id.* § 164 cmt. b. North Carolina is, therefore, the location of the injury causing conduct for purposes of determining which state has the most significant relationship to the contributory negligence issue. *See Black*, 2010 WL 4702344, at *11.

In sum, the negligent and gross/intentional conduct involving the design, manufacture, assembly, marketing and/or distributing of the guardrail end unit and the punitive damages

---

[3] Although Texas and North Carolina laws differ on the impact a plaintiff's negligence may have on her ability to recover, both states take into consideration a plaintiff's conduct in determining recovery. North Carolina's contributory negligence defense operates as a complete bar to recovery. *See Champs Convenience Stores, Inc. v. United Chem. Co.*, 406 S.E.2d 856, 861 (N.C. 1991). Texas, on the other hand, uses a comparative fault model. *See Dugger v. Arredondo*, 408 S.W.3d 825, 836 (Tex. 2013).

8

issues favor application of Texas law. The location of the conduct which is alleged to constitute contributory fault favors application of North Carolina law.

### 3. *The Domicile, Residence, Nationality, Place of Incorporation, and Place of Business of the Parties*

Plaintiff is a North Carolina resident. Defendants are Delaware companies with their business operations in Texas. This contact is thus neutral as to which law applies.

### 4. *The Place Where the Relationship, if any, Between the Parties is Centered*

The final contact under Restatement § 145 asks where the parties' relationship is centered. "When there is a relationship between the plaintiff and the defendant and when the injury was caused by an act done in the course of the relationship, the place where the relationship is centered is another contact to be considered." Restatement § 145 cmt. e.

Defendants argue that, because "the only relationship alleged to exist arises from an automobile crash that occurred in North Carolina," which is the place of injury, this contact weighs in favor of applying North Carolina law. (ECF No. 98 at 20.) Plaintiff, on the other hand, urges that this contact weighs in favor of applying Texas law, arguing that for product liability claims, as in this case, Texas courts hold that the relationship between the parties centers on where the product was manufactured, designed, and marketed. (ECF No. 99 at 15–16.)

This Court finds neither of the parties' arguments persuasive or their cited cases directly on point. Here, there was no indirect or direct relationship between Defendants and Plaintiff. Thus, the Court is persuaded by Texas courts that have concluded that this contact was inapplicable when there was no relationship between the parties before the accident. *See, e.g., Crisman v. Cooper Indus.*, 748 S.W.2d 273, 278 (Tex. App. 1988) (holding that where the

relationship was centered was inapplicable in case alleging product liability "because the opposing parties had no relationship between them prior to the accident"); *accord Grosskopf v. Chrysler Grp. LLC*, No. A-14-CA-801-SS, 2015 WL 6021851, at *5 (W.D. Tex. Oct. 14, 2015) ("A plaintiff's mere contact with a defendant's product does not constitute the type of relationship Section 145 contemplates."). Because Plaintiff and Defendants had no direct or indirect relationship prior to the accident, the Court concludes that this contact is neutral.

   5. *Summary of Section 145 Contacts*

Having considered the factual contacts outlined in § 145, the Court finds that the first and second contacts emerge as the only relevant contacts for the Court to consider. The first contact, the location of the injury, clearly weighs in favor of applying North Carolina law. The second contact, the location of the conduct causing the injury, however, is not so straightforward. While the conduct causing the injury as alleged in Plaintiff's Complaint favors application of Texas law, the conduct allegedly giving rise to the contributory fault issue favors application of North Carolina law.

According to the Restatement, where the conduct and personal injury occur in different states, "the local law of the state of injury will usually be applied to determine most issues involving the tort." Restatement § 146 cmt. e; *see also id.* § 156 cmt. b. Further, § 164 of the Restatement indicates that application of the law of the state of injury is perhaps more likely when the plaintiff's conduct that constitutes the alleged contributory fault occurs in the state of injury. *See id.* § 164 cmt. b. While these sections of the Restatement appear to support the application of North Carolina law as it relates to the second contact, both the Texas Supreme Court and the Restatement make clear that the § 145 contacts "must [be] evaluat[ed] . . . in

10

light of the state policies underlying the particular substantive issue." *Torrington*, 46 S.W.3d at 848; Restatement § 145(2). It is the significance of the § 145(2) contacts in relation to the § 6 policy considerations, not the number of the § 145(2) contacts, that governs the choice-of-law analysis. *Rosenthal v. Ford Motor Co.*, 462 F. Supp. 2d 296, 303 (D. Conn. 2006); *see Duncan*, 665 S.W.2d at 421. Thus, the Court must evaluate the significance of the § 145(2) contacts in light of the § 6 policy considerations to determine whether Texas or North Carolina law applies here.

### B. Section 6 Policy Factors

Not all of § 6's policy factors will be equally important in every case. *Rosenthal*, 462 F. Supp. 2d at 303. The Restatement states that choice-of-law factors (d) the protection of justified expectations of the parties, (e) the basic policies underlying the particular field of law, and (f) certainty, predictability and uniformity of result are "of lesser importance in the field of torts."[4] Restatement § 145 cmt. b. The remaining factors therefore "assume greater importance," *id.*; however, the Restatement does caution that factor (g) ease in determination and application of the law to be applied, "should not be overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results," *id.* § 6 cmt. j. Ultimately, choice-of-law rules lead to desirable results where the court evaluates the competing interests of each state and identifies the state most significantly related to the particular issue that needs to be resolved.

---

[4] While the Restatement states that factor (e) is not as important in tort cases, Texas courts have emphasized this policy factor in determining which forum has the most significant relationship to an issue. *See, e.g.*, *Vizcarra v. Roldan*, 925 S.W.2d 89, 91 (Tex. App. 1996).

11

Defendants primarily argue that the § 6 policy factors favor application of North Carolina law to Plaintiff's claims because North Carolina has an interest in having its laws, including its contributory negligence framework, applied to a collision involving a North Carolina resident on a North Carolina highway. (ECF No. 98 at 10–14.) Plaintiff, on the other hand, contends, among other things, that Texas' interest in consumer protection and regulation of manufacturers within its borders outweighs North Carolina's interest in applying its product liability and contributory negligence laws. (*See* ECF No. 99 at 19.) The Court concludes that the policy factors weigh in favor of application of Texas law to the claims in this action.

### 1. *The Needs of the Interstate and International Systems*

The first factor "seek[s] to further harmonious relations between states and to facilitate commercial intercourse between them." Restatement § 6 cmt. d. Neither party has provided any evidence or argument that the resolution of the choice-of-law issues in this case will have any impact on the goal of facilitating commerce between Texas and North Carolina. Thus, the Court finds this factor to be neutral to its analysis.

### 2. *Relevant Policies of Texas and North Carolina and Basic Policies Underlying Tort Issues*

The Court will analyze policy factors (b), (c), and (e) together.[5] They are: (b) the relevant policies of the forum; (c) the relevant policies of other interested states in the determination of the particular issue; and (e) the policies underlying the particular field of law.

---

[5] *See Sulak v. Am. Eurocopter Corp.*, 901 F. Supp. 2d 834, 845 (N.D. Tex. 2012) (analyzing (b), (c), and (e) together).

The Restatement advises that courts should not only have regard for the forum state's policy in a common law rule or statute but also of the relevant policies of all other interested states. *See* Restatement § 6 cmts. e & f. Ultimately, the court should "seek to reach a result that will achieve the best possible accommodation of these policies." *Id.* § 6 cmt. f. Because this case was transferred from a Texas forum, for purposes of the choice-of-law analysis, Texas is considered the forum state. *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 600 (4th Cir. 2004) ("[W]hen a lawsuit is transferred from one federal court to another pursuant to 28 U.S.C. § 1404(a), the transferee court is obliged to apply the choice-of-law rules that the transferor court would have applied."); *see also Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) ("A change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms.").

   a. Texas' Policy Interests

According to the United States Court of Appeals for the Fifth Circuit:

> The Texas legislature and courts have developed an almost paternalistic interest in the protection of consumers and the regulation of the conduct of manufacturers that have business operations in the state. The expansive Texas system of tort liability for defective products serves as an incentive to encourage safer design and to induce corporations to control more carefully their manufacturing processes. This interest is particularly strong when the defective product in question was manufactured and placed in the stream of commerce in the State of Texas.

*Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 250 (5th Cir. 1990) (citations omitted). Consistent with its expansive system of tort liability, Texas adopted strict product liability laws[6]

---

[6] *See Sanchez v. Brownsville Sports Ctr.*, 51 S.W.3d 643, 669–70 (Tex. App. 2001), *vacated by settlement agreement*.

13

and a comparative fault model, which seeks to apportion liability according to the fault of the parties, allowing a plaintiff to recover as long as his or her own responsibility does not exceed 50%, *see Nabors Well Servs., Ltd. v. Romero*, 456 S.W.3d 553, 559–60 (Tex. 2015). In addition, Texas punitive damages law seeks to punish and deter wrongdoing by corporations within its borders. *See Tobin v. AMR Corp.*, 637 F. Supp. 2d 406, 422 (N.D. Tex. 2009) ("The Court finds that Texas law should apply, because Texas has an interest in whether allegedly wrongful acts committed by Texas corporations should be punished. Illinois has no interest in shielding a foreign company from such liability."). Thus, Texas' interests would be furthered by the application of Texas law in a case involving a company headquartered in Texas that allegedly placed a defective product into the stream of commerce in Texas, leading to injury in North Carolina. *See* Restatement § 6 cmt. e ("If the purposes sought to be achieved by a local statute or common law rule would be furthered by its application to out-of-state facts, this is a weighty reason why such application should be made."); *Sanchez*, 51 S.W.3d at 670–71 (affirming trial court's application of Texas law, holding while Mexico has a great interest in seeing that its citizens are compensated in product liability action and regulating the use of that product within its borders, this matter involves the competing interest of Texas, where the product entered the stream of commerce, giving Texas an "appreciable interest" in applying its law).

  b. North Carolina's Policy Interests

The North Carolina General Assembly enacted a statutory prohibition against strict liability in product liability actions and codified its contributory negligence doctrine within the statute. N.C. Gen. Stat. § 99B-1.1 ("There shall be no strict liability in tort in product liability actions."); *Nicholson v. Am. Safety Utility Corp.*, 488 S.E.2d 240, 244 (N.C. 1997) ("At common

14

law, [a] plaintiff is contributorily negligent when he fails to exercise such care as an ordinarily prudent person would exercise *under the circumstances* in order to avoid injury [and] N.C.G.S. § 99B-4(3) does not create a different rule for products liability actions[.]" (first alteration in original) (internal quotation marks and citations omitted)); *see id.* ("In a product liability action founded on negligence, '[t]here is no doubt that . . . [plaintiff's] contributory negligence will bar his recovery to the same extent as in any other negligence case.'" (alterations in original) (quoting *Smith v. Fiber Controls Corp.*, 268 S.E.2d 504, 510 (N.C. 1980))).

In a report to the North Carolina General Assembly, the Legislative Research Division clearly explains that the purpose behind North Carolina's Product Liability Act was to protect the state's business interests. The Legislative Research Commission explained:

> In response to rapidly escalating premiums for products liability insurance and to potential non-availability of such coverage, the 1979 General Assembly enacted comprehensive legislation to remedy these problems. . . . By codifying North Carolina's case law, . . . the General Assembly intended to guarantee the continued availability of products liability insurance coverage to North Carolina manufacturers, wholesalers, and retailers; and thereby assure that these persons would be able to continue their businesses without the fear of large monetary losses and resultant insolvencies, bankruptcies, and cessation of operations.

Products Liability Report to the 1981 General Assembly of North Carolina, at 2. (Jan. 14, 1981); *see Boudreau v. Baughman*, 356 S.E.2d 907, 911 (N.C. Ct. App. 1987) (explaining that "the public policy of this State is to protect North Carolina manufacturers and designers . . . from stale claims" in product liability case involving statute of repose), *aff'd in part and rev'd in part on other grounds*, 368 S.E.2d 849 (N.C. 1988); *see also Black*, 2010 WL 4702344, at *16 ("North Carolina's more stringent products liability laws were intended to protect its own manufacturers, and that in the absence of a North Carolina defendant, the state lacked a

15

significant interest in the application of its laws."); *Brewer v. Dodson Aviation*, 447 F. Supp. 2d 1166, 1183 (W.D. Wash. 2006) ("[T]he purpose of North Carolina's . . . prohibition on strict liability in product liability actions, is to [presumably] protect North Carolina businesses[.]").

Likewise, studies reveal that North Carolina's primary motivation in its contributory negligence doctrine is concern regarding the impact of insurance rates on the state's businesses. *See* Legis. Res. Comm'n, Laws of Evidence and Comparative Negligence Report to the 1981 General Assembly of North Carolina, at 2, 7, 13–18 (Jan. 14, 1981) (studying North Carolina's contributory negligence system and addressing the primary concern involving the impact on insurance rates if the state moved away from a contributory fault system); *see* Steven Gardner, *Contributory Negligence, Comparative Negligence, and Stare Decisis in North Carolina*, 18 Campbell L. Rev., 1, 33, 42–43, 47 54–55 (1996) (explaining that one of the principle arguments in maintaining North Carolina's contributory fault system is concern regarding insurance costs). Like Texas, the purpose of punitive damages in North Carolina is "to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." N.C. Gen. Stat. § 1D–1.

    c. Texas' Interests Outweigh North Carolina's Interests

Balancing both states' respective interests, the Court concludes that Texas' interests outweigh North Carolina's interests on the facts of this case. Texas, through its strict liability and comparative fault model, has a powerful interest in regulating the conduct of its manufacturers and vindicating the rights of individuals harmed by their conduct. *See Greenberg Traurig of N.Y P.C. v. Moody*, 161 S.W.3d 56, 73 (Tex. App. 2004) ("Generally, the state where the act or omission occurs has a real interest in applying its law in order to implement the

state's regulatory policy as reflected in that law."); *see also Sico N. Am., Inc. v. Willis*, No. 14-08-000158-CV, 2009 WL 3365856, at *4–6, 11 (Tex. App. 2009) (affirming trial court's judgment that Minnesota law applied because the Minnesota corporation designed, manufactured, and placed the allegedly defective product into the stream of commerce, implicating Minnesota's interest in regulating companies that operate within its borders); *Crisman*, 748 S.W.2d at 277–78, 280, 282 (affirming trial court's judgment that Texas law did not apply because the "issue in tort" between the parties "is the design, manufacture, and placing in the stream of commerce" a product that was not designed, manufactured, or placed into the stream of commerce in Texas).

By not recognizing strict liability and recognizing contributory negligence, "North Carolina's product liability law 'expresses no interest in regulating the conduct of the defendant, but rather limits the liability exposure to which his conduct subjects him.'" *Rosenthal*, 462 F. Supp. 2d at 305 (quoting *O'Connor v. O'Connor*, 519 A.2d 13, 24 (Conn. 1986)). Defendants are Texas companies that have allegedly designed and manufactured an allegedly defective product in Texas that caused injury to a North Carolina resident. Applying Texas law not only furthers that state's interests but in no way offends North Carolina's policy interests, which primarily concern protecting the state's business industry against escalating insurance costs. On the other hand, Texas' interests in regulating products manufactured in Texas and providing compensation for persons injured by its companies may be significantly frustrated by application of North Carolina law to Plaintiff's claims against Defendants.

Defendants, nevertheless, argue that North Carolina remains interested because Plaintiff's injury occurred in North Carolina and Plaintiff's conduct the night before and the

morning of the collision implicates the state's contributory negligence framework. (ECF No. 98 at 12.) Defendants state further that North Carolina's contributory negligence doctrine is based on North Carolina's policy that "all of the circumstances during the plaintiff's use of the product must be considered, not just plaintiff's conduct with respect to the product itself." (*Id.* at 11–12 (quoting *Nicholson*, 488 S.E.2d at 244).) While Defendants are correct that the injury occurred in North Carolina, the significance of the location where the injury occurred is diminished in cases involving product liability claims. *See McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 426 (5th Cir. 2001) (affirming district court's determination that Texas law applied, explaining that, while the plaintiff was injured in Canada and was a Canadian resident, "the relevant conduct that [the plaintiff] claims gave rise to his injuries [included] the marketing and manufacturing of the helicopter, [which] took place in Texas, where [the defendant] maintained its principal place of business"); *Linden v. CNH Am. LLC*, 753 F. Supp. 2d 870, 875 (S.D. Iowa 2010) (explaining that in a product liability case, the place where the design, manufacture, and marketing conduct occurred is of greater importance than the place of injury); *Rosenthal*, 462 F. Supp. 2d at 304–05 (noting that the place of injury, though a significant factor in many tort cases, should not be given undue weight in product liability actions); *Perry*, 786 S.W.2d at 24–26 (reversing trial court's decision to apply Indiana law, explaining that while it is undisputed that the injury occurred in Indiana to Indiana residents, the product was manufactured in Texas by a company located and registered to do business in Texas and thus Texas is the place where the conduct causing the injury occurred).

Moreover, North Carolina's interest in regulating conduct and accidents on its highways is not frustrated by application of Texas law. North Carolina's interests are protected

by its ability to charge criminal penalties for violations of its laws. *See Sinnott v. Thompson*, 32 A.3d 351, 357 (Del. 2011) ("[W]e conclude that North Carolina's interests are sufficiently protected by its ability to impose criminal penalties for violating its motor vehicle laws.") Resolving a civil case between a North Carolina resident and a Texas company under Texas law does not negatively impact such interests. *See id.*

Considering the underlying policy considerations of each state, Texas has a greater interest in having its product liability and punitive damages laws applied to a case involving a Texas company that allegedly designed, manufactured, and placed into the stream of commerce a product in Texas that caused injury.[7] This result aligns with two of the basic policies underlying the field of tort law: deterrence of tortious conduct and compensation for injured victims. *See* Restatement § 145 cmt. b. The Court concludes that policy factors (b), (c), and (e) weigh decisively in favor of applying Texas substantive law to Plaintiff's claims.

3. *Remaining Factors*

The remaining § 6 policy factors include (d) the protection of justified expectations, (f) certainty, predictability, and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Policy factors (d) and (f) generally carry more weight in commercial cases, where the

---

[7] Although the policies underlying punitive damages in both states seek to deter and punish elevated forms of misconduct, because Texas is the place where the alleged intentional and gross negligent conduct occurred, Texas' interest in having its punitive damages law applied to this case outweighs North Carolina's interest. *See* Restatement § 145 cmt. c ("If the primary purpose of the tort rule involved is to deter or punish misconduct, . . . the state where the conduct took place may be the state of dominant interest and thus that of most significant relationship."); *see also Black*, 2010 WL 4702344, at *11 (noting that place where the conduct causing injury occurred is where punitive damages issue is properly situated).

19

parties are likely to have molded their conduct to conform to the requirements of another state. *See* Restatement § 6 cmts. g & i. In tort cases, however, it is unlikely the parties have given any thought to the consequences of their conduct. *See id.*; *see also Avram v. Samsung Elecs. Am., Inc.*, Nos. 2:11-6973(KM), 2:12-976(KM), 2013 WL 3654090, at *16 (D. N.J. July 11, 2013); *Sulak*, 901 F. Supp. 2d at 845–46. The final policy factor, ease in determination and application of the law, is designed to make choice-of-law rules simple and easy to apply, but should not be overemphasized in the choice-of-law analysis. Restatement § 6 cmt. j. As a federal court sitting in diversity jurisdiction, the Court is often called upon to apply the law of states other than the one in which the Court sits and thus can apply either Texas or North Carolina law with the same degree of ease. Section 6 factors (d), (f), and (g) are thus neutral and do not aid the Court in resolution of the choice-of-law issues in this case.

## IV. CONCLUSION

Balancing the contacts and policy factors under §§ 6 and 145 of the Second Restatement of Conflict of Laws, the Court concludes that Texas substantive and punitive damages laws must be applied to this case.

For the reasons outlined herein, the Court enters the following:

### ORDER

IT IS THEREFORE ORDERED that Defendants' Motion to Apply North Carolina law (ECF No. 97) is DENIED, and Texas substantive and punitive damages laws shall be applied in this case.

This, the 27th day of February, 2017.

/s/ Loretta C. Biggs
United States District Judge